USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 8/4/2026

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| STEVEN WILLIAMS,<br><br>Plaintiff,<br><br>-against-<br><br>THE CITY OF NEW YORK, JOSE RODRIGUEZ, NEON CHOWDHURY, ALEX ALMONTEPICHARDO, JOSEPH RINALDO, DANIEL LIBERATORE, JOSE GOMERA, MICHAEL MARRONE, and ANTHONY RIVERA,<br><br>Defendants. | : | 24-CV-806 (VEC)<br><br><u>OPINION AND ORDER</u> |

VALERIE CAPRONI, United States District Judge:

On February 2, 2024, Steven Williams ("Plaintiff") sued the City of New York (the "City") and New York Police Department ("NYPD") officers Jose Rodriguez, Neon Chowdhury, Alex Almontepichardo, Joseph Rinaldo, Daniel Liberatore, Jose Gomera, Michael Marrone, and Anthony Rivera (collectively, the "Individual Defendants," and with the City, "Defendants") alleging various civil rights violations related to his 2022 arrest and prosecution. *See generally* Compl., Dkt. 1. Fact discovery concluded in August 2025. *See* Dkt. 75. On January 6, 2026, Defendants moved for summary judgment on all counts. Dkt. 83. Plaintiff opposed the motion on February 20, 2026. Dkt. 89. For the following reasons, Defendants' motion for summary judgment is GRANTED in part and DENIED in part.

# BACKGROUND[1]

This lawsuit stems from an incident that occurred near Plaintiff's residence on East 169th Street in the Bronx, New York, on November 6, 2022. 56.1 Stmt. ¶¶ 1–2.[2] At some point before 7:50 P.M., Plaintiff and his girlfriend, Lashonda Simmons, were involved in a verbal dispute[3] outside of their apartment with various of their East 169th Street neighbors, including Vincent

---

1 These material facts are gathered from the parties' consolidated Rule 56.1 statement, Dkt. 93 ("56.1 Stmt."), the exhibits to the parties' submissions, and the parties' summary judgment briefs. The facts are construed in the light most favorable to the non-moving party. *See Wandering Dago, Inc. v. Destito*, 879 F.3d 20, 30 (2d Cir. 2018). All facts are undisputed unless otherwise indicated. The Court will refer to the relevant submissions as follows: Defendants' memorandum of law in support of its motion, Dkt. 86, as "Def. Br."; Plaintiff's memorandum in opposition to Defendants' motion, Dkt. 89, as "Pl. Opp."; and Defendants' reply memorandum, Dkt. 92, as "Def. Reply." Citations to alphabetical exhibits (*e.g.*, "Ex. A") refer to the exhibits appended to the Declaration of Zachary Kalmbach, Dkt. 84. Citations to numerical exhibits (*e.g.*, "Ex. 1") refer to the exhibits appended to the Declaration of Clyde Rastetter, Dkt. 90.

2 Pursuant to Local Civil Rule 56.1(a), a party seeking summary judgment must file "a separate, short, and concise statement, in numbered paragraphs, of the material facts as to which the moving party contends there is no genuine issue to be tried." A Rule 56.1 statement is designed to require the parties to clarify the elements of the various claims that are and that are not at issue and to identify clearly the facts that are contested. *See Monahan v. N.Y.C. Dep't of Corr.*, 214 F.3d 275, 292 (2d Cir. 2000). Plaintiff added substantially to the length of the Rule 56.1 statement with his insistence on contextualizing, editorializing, and otherwise quibbling with Defendants' "characterization" of facts, even if the crux of Defendants' assertions is not seriously in dispute. *See, e.g.*, 56.1 Stmt. ¶¶ 2–5, 7–8, 11, 13. Plaintiff's own Rule 56.1 counterstatement is unhelpful, as it spans 36 pages and consists of 108 paragraphs, *see* Dkt. 91, and reads more like an opposition brief than a collection of "separate, short and concise . . . additional material facts as to which it is contended that there exists no genuine issue to be tried." Loc. Civ. R. 56.1(b). Courts in this District have repeatedly admonished parties not to use Rule 56.1 statements in this way. *See, e.g.*, *Toussaint v. N.Y. Dialysis Servs., Inc.*, 230 F. Supp. 3d 198, 201 n.1 (S.D.N.Y. 2017), *aff'd*, 706 F. App'x 44 (2d Cir. 2017) ("The Court finds unhelpful Plaintiff's insistence on 'denying' or qualifying facts alleged to be undisputed by Defendant merely because he disagrees with their significant in the case or finds other facts more relevant."); *Tripathy v. McCloskey*, No. 21-CV-6584, 2024 WL 2135623 (CS), at *2 (S.D.N.Y. May 13, 2024) ("[T]he purpose of a [Rule] 56.1 response is simply to advise the Court as to whether the specific fact asserted by the moving party is or is not disputed, and if it is disputed, to provide the Court with the evidence on which the non-moving party relies to dispute that particular fact. It presents no occasion for context, argument, semantic quibbles, opinions or conclusions.").

Despite Plaintiff's failure to submit an appropriate response to Defendants' 56.1 Statement, the Court will parse the record to resolve Defendants' summary judgment motion appropriately. The Court has sifted through the parties' submissions and reviewed the evidentiary record in this case, including the relevant video exhibits and NYPD body-worn camera ("BWC") footage. For purposes of this motion, the Court deems "undisputed" those facts about which the parties substantively agree and those facts that are otherwise incontrovertible based on the video and documentary evidence the parties submitted.

3 Although the nature of the dispute is immaterial to the present motion, Plaintiff asserts, and Defendants are willing to concede, that Plaintiff and Ms. Simmons were angry at their neighbors for being noisy. *See* Def. Br. at 3; Pl. Opp. at 3.

Heyliger and Lillian Ocasio Rodriguez. *Id.* ¶¶ 2, 38.[4] Rodriguez and Chowdhury, both NYPD officers, were across the street. *Id.* ¶ 33. Ms. Simmons had spoken to them, allegedly regarding her concerns about Heyliger and his companions. *See id.* ¶¶ 33–37.[5] The parties dispute what, exactly, Rodriguez, Chowdhury, and Simmons discussed. *See id.* ¶¶ 36–37. It is undisputed, however, that Ms. Simmons subsequently returned to the apartment building, while Rodriguez and Chowdhury remained posted across the street. *See id.* ¶¶ 6–8, 38–40.

Shortly after Ms. Simmons spoke to Rodriguez and Chowdhury what had started as a verbal dispute between Ms. Simmons and her neighbors became physical. *See id.* ¶¶ 3, 41.[6] Video evidence shows Plaintiff, now out of the apartment building, being flanked by his neighbors; someone grabbed his shirt and Heyliger and others assaulted him. *Id.* ¶¶ 4–6, 40–41.[7] Eventually, Plaintiff found himself pinned against the front gate of the apartment building; his assailants punched him while he fought back. *Id.* ¶ 42; *see also* Ex. 1, Dkt. 90-1 at 7:50–8:14; Ex. B, Dkt. 84-2 at 0:40–1:08. At this point, having "observed the physical struggle involving [P]laintiff," Defendants Rodriguez and Chowdhury crossed the street to intervene. *See id.* ¶¶ 7–

[4] Plaintiff disputes Defendants' characterization of the incident as a "dispute" and alleges that "the Complaint and video evidence portray an unprovoked and violent attack on Plaintiff by three men, one of whom was armed with a long red bat." 56.1 Stmt. ¶ 2. The Court has a few observations. First, at this stage in the litigation, the version of events recounted in the Complaint matters little; Defendants' summary judgment motion will rise and fall on the evidentiary record, not on Plaintiff's pre-discovery allegations. Second, in his own Rule 56.1 counterstatement, Plaintiff maintains that the parties were involved in a "verbal argument" after one of Plaintiff's neighbors "made a comment and spit at" Ms. Simmons. *Id.* ¶ 38; *see also* Pl. Opp. at 3. It is not clear how Plaintiff can seriously quarrel with Defendants' characterization of the incident as a "dispute" when his own description of the event, when stripped of its rhetorical flare, is substantively identical.

[5] At this time, Plaintiff was inside the apartment building and watching Ms. Simmons on the building's security cameras. 56.1 Stmt. ¶ 34.

[6] Plaintiff again contests Defendants' description of the dispute as becoming "physical," because "the incident did not 'become physical' in the mutual sense implied," as "Plaintiff was surrounded and attacked." *Id.* ¶ 3.

[7] As Plaintiff began to struggle with his neighbors, Ms. Ocascio Rodriguez fell to the ground. *Id.* ¶ 4. Ms. Simmons then joined the melee, stomping on Ms. Ocascio Rodriguez's head and neck while she lay on the pavement. *Id.* ¶ 5.

8, 43–44.[8] Rodriguez tried to stop the struggle between Plaintiff, Heyliger, and others, while Chowdhury sought to separate Ms. Simmons from two men she was threatening with a bottle. *Id.* ¶¶ 8–9, 44.[9] Not long after the officers managed to separate the clashing individuals, one of Plaintiff's neighbor-assailants grabbed a baseball bat from inside the gate of the apartment and charged towards Rodriguez and Plaintiff. *Id.* ¶ 47.[10] Plaintiff then ran down the street; Heyliger and others, one of whom was still wielding the bat, gave chase while Defendant Rodriguez followed behind. *Id.* ¶¶ 11–12, 48–49.[11] Defendant Chowdhury remained with Ms. Simmons and others at the apartment building. *Id.* ¶ 12.

The parties dispute the details of what occurred next. *See id.* ¶¶ 13, 50–52. At some point, Heyliger caught up to Plaintiff; Plaintiff pulled out a small pink knife and stabbed Heyliger in the abdomen before retreating into a convenience store. *Id.* ¶¶ 13, 50–51. Defendant Rodriguez, still lagging behind Plaintiff and Heyliger, did not witness the stabbing. *Id.* ¶¶ 50–51. Eventually, however, Rodriguez reached Heyliger and the other men who had chased

---

8 Plaintiff contends that the entire incident "occurred in full view of Defendants Rodriguez and Chowdhury" from their post across the street, which Defendants dispute. *Id.* ¶ 43. The parties do not dispute, and the video evidence makes clear, that Rodriguez and Chowdhury remained across the street at the outset of the melee, crossing the street only after Plaintiff was surrounded by his neighbors and exchanging mutual blows while pinned against the gate. What, exactly, Rodriguez and Chowdhury saw prior to crossing the street is a disputed issue of fact. *See* 56.1 Stmt. ¶¶ 7, 43, 45.

9 Plaintiff disputes Defendants' characterization that Ms. Simmons was "threatening" the men "with a bottle." *Id.* ¶ 9. The apartment's security footage clearly depicts Ms. Simmons reaching into a recycling bin, retrieving a bottle, and wielding the object as the altercation unfolds. *See* Ex. B at 1:00–1:28.

10 Defendants dispute this "insofar as the . . . evidence does not support the allegation that [D]efendants Rodriguez and Chowdhury observed a male with a bat charge at Rodriguez." 56.1 Stmt. ¶ 47. The apartment's security footage and images from Rodriguez's body-worn camera ("BWC") clearly show a man approaching Plaintiff and Rodriguez holding a bat; the videos show that Rodriguez attempted to disarm the assailant before he reached Plaintiff. Ex. B at 2:00–2:15; Ex. E., Dkt. 84-5 at 19:51:52–19:52:20 (Rodriguez BWC). What Chowdhury witnessed is a disputed question of fact.

11 The parties dispute the alacrity with which Defendant Rodriguez pursued Plaintiff and his assailants. *See* 56.1 Stmt. ¶¶ 12, 49. Plaintiff contends that the evidence shows Rodriguez followed at a "leisurely" walking pace, while Defendants claim that Rodriguez "ran towards [P]laintiff and the other men." *Id.* ¶¶ 12, 49.

Plaintiff. *Id.* ¶ 52. Rodriguez did not attempt to detain or disarm them. *Id.* ¶¶ 52, 85.[12] Instead, Rodriguez instructed the men to "go home," stating "we got him." *Id.*[13] Up to this point, no one had informed Rodriguez that Heyliger had been stabbed. *Id.* ¶ 53.

Rodriguez continued toward the convenience store where Plaintiff had taken shelter. As he approached, Plaintiff exited the store, his shirt in tatters, exclaiming that "[Heyliger and the others] just tried to kill me." *Id.* ¶ 55. Rodriguez responded by telling Plaintiff to "shut the fuck up." *Id.* ¶ 55. Other NYPD officers, including Defendants Almontepichardo and Rinaldo, began to gather outside the storefront. *Id.* ¶¶ 15, 55. The officers' BWC footage shows that, moments later, Rodriguez and the others turned towards the street, where Heyliger was approaching with his shirt pulled up, exposing a stab wound. *Id.* ¶ 16. Rodriguez then turned back to Plaintiff and demanded that he "step down" from the store's front stairs. *See* Ex. E at 19:53:51–19:54:11. As Heyliger reached the officers on the sidewalk, Defendant Almontepichardo removed his hand cuffs from his belt and placed them on Plaintiff. 56.1 Stmt. ¶¶ 18, 56.[14] Almontepichardo then recovered a knife from Plaintiff's pant pocket. *Id.* ¶ 17.

---

12 The individual who had previously charged at Plaintiff and Rodriguez was still holding the baseball bat. *See* Ex. E at 19:52:45–19:52:53.

13 The parties dispute whether "him" was a reference to Plaintiff. 56.1 Stmt. ¶¶ 52–54.

14 The parties agree that Heyliger eventually informed the officers that Plaintiff had stabbed him but disagree whether Plaintiff was handcuffed before or after Heyliger made that clear. *See id.* ¶¶ 16, 56–58. At Almontepichardo's deposition, he was asked: "At the time . . . when you . . . started placing handcuffs on [Plaintiff], had you learned about the stabbing yet?" Almontepichardo responded "No." *See* Ex. 8, Dkt. 90-8 at 248:24–249:19; *see also* 56.1 Stmt. ¶ 57. Earlier in the deposition, however, Almontepichardo indicated that, as Heyliger approached, he "point[ed] out [that] the gentleman that was standing at the top of the stairs," *i.e.*, Plaintiff, had "stabbed him." Ex. 8 at 66:2–19. Almontepichardo also stated repeatedly that he could not remember whether he was aware of the stabbing prior to his arriving on the scene. *See, e.g.*, *id.* at 96:24–97:3, 99:6–101:21.

The BWC footage does little to clarify. As Heyliger approaches the officers from across the street, he is holding his shirt up and motioning toward Plaintiff, but his words are inaudible. *See, e.g.*, Ex. E at 19:54:04–19:54:13. From the Court's point of view, it is plausible that Heyliger was attempting to inform the officers that Plaintiff had stabbed him, which prompted Almontepichardo and Rodriguez to place Plaintiff in handcuffs. But it is unclear. As such, whether the officers knew of the stabbing *before* detaining Plaintiff remains a disputed question of fact.

Over the next forty minutes, the remainder of the Individual Defendants[15] trickled onto the scene. *See id*. ¶ 59. As the officers conferred about the situation, *see id.* ¶ 98, witnesses and others involved in the initial altercation, including Ms. Simmons, made their way from the apartment building on East 169th Street to the storefront area where Plaintiff was being detained and the officers had congregated. *See id.* ¶¶ 64–66, 71–73, 76 (collecting relevant BWC footage). The BWC footage shows Plaintiff, Ms. Simmons, and others explaining that Plaintiff had been "jumped" and begging the officers to review footage (of the initial altercation outside the apartment complex), which had been captured by the building's security system. *See id.* ¶¶ 64–67. Separately, Defendant Marrone canvased nearby stores for video footage that may have captured Heyliger's stabbing, to no avail. *Id.* ¶ 70. There is no evidence in the record that anyone witnessed, nor that any security camera recorded, Heyliger being stabbed.[16] That said, at no point during the investigation did any officer make an affirmative attempt to record the pedigree information of the witnesses who allegedly saw the initial brawl outside of Plaintiff's apartment. *Id.* ¶¶ 76–77, 82–84; *see also* Ex. 23, Dkt. 90-23 (Individual Defendants' (mostly

[15] The Individual Defendants are variously assigned to the NYPD's 41st and 42nd Precincts. Because the altercations took place between jurisdictions, there was some initial confusion as to which precinct would be responsible for investigating and processing Plaintiff's arrest. *See* Def. Br. at 4 n.4; 56.1 Stmt. ¶¶ 61–62, 93–94.

[16] Plaintiff's Rule 56.1 counterstatement notes that "[d]uring Defendants' on scene investigation, multiple bystander eyewitnesses also approached them to corroborate Plaintiffs' account of what had happened, and to attest to his innocence." 56.1 Stmt. ¶ 71. It appears, however, that the witnesses were only knowledgeable about the initial altercation outside of the apartment building, not the stabbing. Defendants are correct that "there is no evidence in the record that any officer witnessed the stabbing" nor that any "bystander witness told any officer that they witnessed the stabbing itself." Def. Reply at 2–3.

blank) activity logs).[17] Back on East 169th Street, Defendant Rivera recovered a sword wrapped in clothing from the bushes outside of Plaintiff's apartment building. 56.1 Stmt. ¶ 88.[18]

After the on-scene investigation, only Plaintiff was placed under arrest and transported to the 42nd Precinct for processing. *Id.* ¶¶ 18, 97. As the arresting officer, "Almontepichardo was responsible for preparing the arrest-related paperwork, including the arrest reports, complaint reports, and other documentation required to be sent to the Bronx District Attorney's office, as well as meeting with an assistant district attorney to convey the facts of the case." *Id.* ¶ 99. Other than what was captured on the Individual Defendants' BWCs, none of the arrest documents forwarded to the district attorney's office mentioned Plaintiff being chased with a bat prior to the stabbing. *Id.* ¶ 103; *see also* Ex. 21, Dkt. 90-21 (Bronx district attorney file); Ex. 24, Dkt. 90-24 (same); Ex. 23 (activity logs). It also appears that Defendant Almontepichardo failed to inform the assistant district attorney of (i) Plaintiff's self-defense claim, and (ii) the witnesses who said they had viewed the initial altercation. *See* 56.1 Stmt. ¶ 105.

The following day, on November 7, 2022, Defendant Almontepichardo signed a criminal complaint that initiated criminal proceedings against Plaintiff. *Id.* ¶ 106; *see also* Ex. I, Dkt. 84-9 (criminal complaint). The complaint included charges for: (i) assault in the second degree; (ii) assault in the third degree; (iii) criminal possession of a weapon in the fourth degree; and (iv) harassment in the second degree. *See* 56.1 Stmt. ¶ 106; *see also* Ex I. Plaintiff was arraigned in

---

[17] Defendants dispute Plaintiff's position that "no witness information was collected or recorded by any officers as part of their investigation into the incident involving Plaintiff," as "all of the witnesses' statements were recorded on" the officers' BWCs, even if not manually recorded in their activity logs. 56.1 Stmt. ¶ 78 (emphases omitted).

[18] The parties disagree about the relevancy of the sword and the manner in which its recovery was handled and documented. *Id.* ¶¶ 88–91. The Court treats as undisputed only that: (i) Defendant Rivera made no entries in his activity log related to the sword; (ii) the sword was not documented as arrest evidence and was ultimately destroyed during the pendency of this case; (iii) no property invoice for the sword was included in the district attorney's file or transmitted to the district attorney; and (iv) Defendant Rivera's BWC footage, which showed him finding the sword, was transmitted to the district attorney. *See id.*

Bronx Criminal Court and released on his own recognizance. 56.1 Stmt. ¶ 19. On December 14, 2022, the district attorney moved to dismiss the felony assault in the second degree charge (*i.e.*, the charge related to Heyliger's stabbing) pursuant to N.Y. C.P.L. § 170.30(1)(f). That statute provides for dismissal when "[t]here exists some other jurisdictional or legal impediment to conviction of the defendant for the offense charged." *Id.* ¶¶ 107–08. As to the remaining charges, Plaintiff accepted an adjournment in contemplation of dismissal pursuant to N.Y. C.P.L. § 170.55. *Id.* ¶ 20.

## LEGAL STANDARD

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial." *Scott v. Harris*, 550 U.S. 372, 380 (2007) (internal quotation marks omitted).

Although the Court must construe the facts in the light most favorable to the non-moving party, "a party may not rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment." *Fed. Trade Comm'n v. Moses*, 913 F.3d 297, 305 (2d Cir. 2019) (internal quotation marks omitted). Accordingly, to defeat a motion for summary judgment, the nonmoving party must produce specific facts showing that there is a genuine issue for trial; a "scintilla of evidence" is not enough. *Fincher v. Depository Tr. & Clearing Corp.*, 604 F.3d 712, 726 (2d Cir. 2010); *see also Sista v. CDC Ixis N. Am., Inc.*, 445 F.3d 161, 169 (2d Cir. 2006); *D'Amico v. City of N.Y.*, 132 F.3d 145, 149 (2d Cir. 1998) (a party "must offer some hard evidence showing that its version of the events is not wholly fanciful"); *Baity v. Kralik*, 51

F. Supp. 3d 414, 417–18 (S.D.N.Y. 2014) (a party opposing summary judgment must "specifically respond to the assertion of each purported undisputed fact . . . and, if controverting any such fact, [must] support its position by citing to admissible evidence in the record").

## DISCUSSION

The Complaint includes claims for: (i) false arrest in violation of the Fourth and Fourteenth Amendments to the United States Constitution and New York law (against the Individual Defendants); (ii) malicious prosecution in violation of the Fourth and Fourteenth Amendments and New York law (against the Individual Defendants); (iii) deprivation of liberty without due process and denial of a fair trial, in violation of 42 U.S.C. § 1983 (against the Individual Defendants); (iv) failure to intervene, in violation of 42 U.S.C. § 1983 (against the Individual Defendants); (v) violations of the New York City Administrative Code (against all Defendants); (vi) assault and battery, in violation of New York law (against all Defendants); and (vii) negligent hiring, screening, training, supervision, and retention (against the City). *See* Compl. ¶¶ 110–158.

### I. False Arrest Claims (Counts I, V)

#### *a. Legal Standard*

An arrest undertaken without a warrant "must be supported by probable cause or else it violates the Fourth Amendment." *United States v. Valentine*, 539 F.3d 88, 93 (2d Cir. 2008). "A [Section] 1983 claim for false arrest, resting on the Fourth Amendment right of an individual to be free from unreasonable seizures, including arrest without probable cause, is substantially the same as a claim for false arrest under New York law." *Weyant v. Okst*, 101 F.3d 845, 852 (2d Cir. 1996) (citations omitted); *accord Jenkins v. City of N.Y.*, 478 F.3d 76, 84 (2d Cir. 2007). Under New York law, a plaintiff claiming false arrest must show that "(1) the defendant intended

to confine the plaintiff, (2) the plaintiff was conscious of the confinement, (3) the plaintiff did not consent to the confinement, and (4) the confinement was not otherwise privileged." *Savino v. City of N.Y.*, 331 F.3d 63, 75 (2d Cir. 2003); *see also Singer v. Fulton Cnty. Sheriff*, 63 F.3d 110, 118 (2d Cir. 1995) (quoting *Broughton v. State of N.Y.*, 37 N.Y.2d 451, 456 (1975)). "With respect to a claim for false arrest, . . . each individual [defendant] must have been personally involved in the arrest in order to be held liable." *Garnett v. City of N.Y.*, No. 13-CV-7083 (GHW), 2014 WL 3950904, at *7 (S.D.N.Y. Aug. 13, 2014) (citing *Colon v. Coughlin*, 58 F.3d 865, 873 (2d Cir. 1995)); *see also Farrell v. Burke*, 449 F.3d 470, 484 (2d Cir. 2006) (discussing personal involvement requirement).

Probable cause for an arrest "is a complete defense to any action for false arrest . . . in New York." *Dickerson v. Napolitano*, 604 F.3d 732, 751 (2d Cir. 2010); *see also Broughton*, 37 N.Y.2d at 456–57. If, as in this case, the arrest "is not made pursuant to a judicial warrant, the defendant . . . bears the burden of proving probable cause as an affirmative defense." *Napolitano*, 604 F.3d at 751 (citing *Broughton*, 37 N.Y.2d at 458). Probable cause "may be determinable" at summary judgment as a matter of law, however, "if there is no dispute as to the pertinent events and the knowledge of the officers[.]" *Weyant*, 101 F.3d at 852 (citing *Singer,* 63 F.3d at 673); *see also Jenkins*, 478 F.3d at 88 ("[S]ummary judgment dismissing a plaintiff's false arrest claim is appropriate if the undisputed facts indicate that the arresting officer's probable cause determination was objectively reasonable."); *Niles v. O'Donnell*, No. 17-CV-1437 (LTS) (BCM), 2019 WL 1411068, at *7–8 (S.D.N.Y. Feb. 21, 2019) (granting summary judgment after finding defendant-officers had probable cause to make arrest).

"An officer has probable cause to arrest when he or she has 'knowledge or reasonably trustworthy information of facts and circumstances that are sufficient to warrant a person of

reasonable caution in the belief that the person to be arrested has committed or is committing a crime.'" *Jaegly v. Couch*, 439 F.3d 149, 152 (2d Cir. 2006) (citing *Weyant*, 101 F.3d at 852); *see also Niles*, 2019 WL 1411068, at *7–8 (collecting cases). It is well-established that "an arresting officer advised of a crime by a person who claims to be the victim . . . has probable cause to effect an arrest absent circumstances that raise doubts as to the victim's veracity." *Singer*, 63 F.3d at 119 (citing *Hebron v. Touhy,* 18 F.3d 421, 422–423 (7th Cir. 1994) and *Miloslavsky v. AES Engineering Soc., Inc.,* 808 F. Supp. 351, 355 (S.D.N.Y.1992), *aff'd*, 993 F.2d 1534 (2d Cir. 1993)); *see also Panetta v. Crowley*, 460 F.3d 388, 395 (2d Cir. 2006) (citing *Martinez v. Simonetti*, 202 F.3d 625, 634 (2d Cir. 2000)); *Niles*, 2019 WL 1411068, at *7–8 (collecting cases).

*b. Application*

As to Plaintiff's false arrest claim, the key question for the Court is whether, viewing the evidence in the light most favorable to Plaintiff, there is a question of fact as to whether any Individual Defendant who participated in the arrest had probable cause to arrest Plaintiff. Defendants argue that they did, as Plaintiff stabbed Heyliger with a knife, which was, "in and of itself, [] enough to establish probable cause." Def. Br. at 8. Plaintiff disagrees, contending that "Defendants were aware" that, "[w]hen the stabbing occurred, Plaintiff was [being] pursued by three men[,] including Heyliger, one of whom had a deadly weapon." Pl. Opp. at 8. In other words, because the Individual Defendants should have known that Plaintiff was acting in self-defense when he stabbed Heyliger, "a jury could reasonably infer" that the officers knew Plaintiff's stabbing of Heyliger was "not criminal" under New York law, thus eliminating probable cause for his arrest. *Id.* at 9.

Plaintiff is correct that, in certain circumstances, "a police officer's awareness of the facts supporting a defense can eliminate probable cause." *See Jocks v. Tavernier*, 316 F.3d 128, 135 (2d Cir. 2003). It is also true that, in New York, the use of physical force in self-defense is an exculpatory defense that can render otherwise criminal conduct "not criminal." *See* N.Y. Penal Law §§ 35.10, 35.15(1). With those principles in mind, and in light of the evidence tending to suggest that Defendants Rodriguez and Chowdhury witnessed the initial altercation outside of Plaintiff's apartment (which culminated in a neighbor charging Plaintiff with a baseball bat and chasing him down the street), the Court concludes that a reasonable jury could find that Rodriguez and Chowdhury knew Heyliger's stabbing was likely in self-defense and, thus, that the two officers lacked probable cause to arrest Plaintiff.[19] The same logic follows for Defendant Almontepichardo, Plaintiff's arresting officer, who admitted that when he handcuffed Plaintiff, "he did not even know that a stabbing had occurred." Pl. Opp. at 10 (citing 56.1 Stmt. ¶¶ 56–58). *But see supra* n.14.

---

19 Defendants argue that, "[g]iven that [] Heyliger was not the one wielding a bat, and that [P]laintiff was clearly able to outdistance his pursuers, it was reasonable for the officers to disregard the claim of self-defense and leave the merits of that claim for later adjudication in court, rather than weigh its merits on a street corner at night." Def. Br. at 8. A jury may well agree that disregarding Plaintiff's self-defense claim was warranted, but the record does not permit such a definitive (and Defendant-friendly) finding on summary judgment when the Court must view the evidence in the light most favorable to Plaintiff. Moreover, Defendants suggest that, by merely telling the officers that he had been stabbed, Heyliger himself established probable cause to justify Plaintiff's arrest. *See* Def. Br. at 8 ("[O]n the basis of [] Heyliger's allegation alone, probable cause existed to arrest [P]laintiff."). Defendants also cite a plethora of cases in which courts have held that a "[a]n arresting officer advised of a crime by a person who claims to be the victim . . . has probable cause to effect an arrest." *Singer*, 63 F.3d at 119; *see* Def. Br. at 8 (collecting cases). That does not mean, and Defendants' cases do not support, the proposition that an arresting officer who *witnesses* events preceding an alleged crime has the prerogative to *disregard* his personal knowledge of those events when deciding whether to make an arrest. Indeed, none of the precedent to which Defendants refer involves an officer who was actively involved at the scene *before* being advised that a crime had taken place.

To put it more finely: "A story is never a single chapter, it is the experience of the entire tale; the same is true of probable cause." *Stansbury v. Wertman*, 721 F.3d 84, 93 (2d Cir. 2013). Here, the record confirms that Defendants Rodriguez and Chowdhury alone were uniquely positioned to substantiate the basis of Plaintiff's self-defense claim. Disputes of fact regarding their actual knowledge and subsequent failure adequately to consider the initial altercation, which they witnessed and were a part of, renders summary judgment inappropriate.

The same cannot be said of the other Individual Defendants (*i.e.*, Rinaldo, Liberatore, Gomera, Marrone, and Rivera), who did not witness the initial altercation at the apartment building. These officers arrived at the scene only *after* Heyliger had been stabbed and saw, at most, an injured and unarmed Heyliger indicating that Defendant had knifed him. This was sufficient to establish probable cause *as to those officers*—notwithstanding Plaintiff's protestations that he was acting in self-defense, nor bystander testimony that Heyliger, not Plaintiff, was at fault. *See, e.g.*, *Wiedner v. City of N.Y.*, 569 F. App'x 28, 29 (2d Cir. 2014) ("Though there were conflicting accounts of the physical altercation, 'we have found probable cause where a police officer was presented with different stories from an alleged victim and the arrestee.'" (quoting *Curley v. Vill. of Suffern,* 268 F.3d 65, 70 (2d Cir. 2001))).

Plaintiff's argument that the later-arriving officers lacked probable cause because they ignored "readily available exculpatory evidence at the scene," Pl. Opp. at 12, is unavailing. While the Court's review of the available records suggests that the investigation lacked the rigor that New Yorkers deserve from the NYPD, the Court cannot say, and no jury could conclude, that it was unreasonable as a matter of law for the officers to rely, as they did, on Heyliger's allegations and the leads of Rodriguez and Chowdhury. It is well established that "[o]nce a police officer has a reasonable basis for believing there is probable cause, he is not required to explore and eliminate every theoretically plausible claim of innocence before making an arrest." *Ricciuti v. N.Y.C. Transit Auth.,* 124 F.3d 123, 128 (2d Cir. 1997) (citing *Baker v. McCollan*, 443 U.S. 137, 145–46 (1979)). Because there is no evidence that other officers had any first-hand[20]

---

[20] Courts generally reject "the notion that every member of a team of officers is, by default, personally involved in every arrest effected by the team" and, thus, subject to liability for false arrest claims. *Rodriguez v. City of N.Y.*, 291 F. Supp. 3d 396, 410 (S.D.N.Y. 2018) (collecting cases, holding that "an [officer] standing 'within feet' of an alleged constitutional violation" does not necessarily demonstrate his involvement in such violation).

information sufficient to undercut their probable cause determination, summary judgment on Plaintiff's false arrest claims is appropriate as to Defendants Rinaldo, Liberatore, Gomera, Marrone, and Rivera.[21] *See, e.g.*, *Provost v. City of Newburgh*, 262 F.3d 146, 155 (2d Cir. 2001) ("'[D]irect participation' as a basis of liability in [the Section 1983] context requires intentional participation in the conduct constituting a violation of the victim's rights *by one who knew of the facts rendering it illegal*." (emphasis added)); *Rodriguez*, 291 F. Supp. 3d 396, 410 (S.D.N.Y. 2018) (granting summary judgment where "[t]here is no evidence in the record that [the officer] identified Plaintiff; ordered his arrest; assisted others in his arrest; touched, searched, or spoke to Plaintiff; processed any of his arrest paperwork; or had any involvement whatsoever in . . . Plaintiff's arrest," beyond his presence at scene).

In sum, Defendants' motion for summary judgment on Plaintiff's false arrest claims (Count I, V) is DENIED as to Defendants Almontepichardo, Rodriguez, and Chowdhury, and GRANTED as to Defendants Rinaldo, Liberatore, Gomera, Marrone, and Rivera.

## II. Malicious Prosecution Claims (Counts II, VI)

### *a. Legal Standard*

To prevail on a malicious prosecution claim under Section 1983, a plaintiff must establish the elements of a state law malicious prosecution claim and also show a violation of his rights under the Fourth Amendment. *See Roberts v. Babkiewicz*, 582 F.3d 418, 420 (2d Cir. 2009). To

---

[21] "On summary judgment, the existence of probable cause may be determined as a matter of law if there is no dispute as to the pertinent events and the knowledge of the officers." *Kayo v. Mertz*, 531 F. Supp. 3d 774, 789 (S.D.N.Y. 2021) (internal quotation marks omitted). It is undisputed that no one, and certainly not the late-arriving officers, witnessed the stabbing; bystanders at the scene could speak only about the altercation in front of Plaintiff's apartment building, and some of their statements were demonstrably unreliable. *See* 56.1 Stmt. ¶¶ 72–73; *see also* Pl. Opp. at 12–13. Given the conflicting information presented to the officers, the Court finds that, as a matter of law, it was reasonable for officers who did not witness the altercations to base their probable cause determination primarily on "the fact that [P]laintiff was uninjured while the complaining victim had a visible stab wound." Def. Reply at 3. Put differently, "whether the officers obtained pedigree information from bystanders who did not even witness the stabbing has no bearing on the probable cause analysis" as to the officers who did not witness the events that led to Plaintiff's detention. *Id.* at 5.

establish a malicious prosecution claim under New York law, a plaintiff must prove "(1) the initiation or continuation of a criminal proceeding against plaintiff; (2) termination of the proceeding in plaintiff's favor; (3) lack of probable cause for commencing the proceeding; and (4) actual malice as a motivation for defendant's actions."[22] *Manganiello v. City of N.Y.*, 612 F.3d 149, 161 (2d Cir. 2010) (internal quotation marks omitted); *see also Murphy v. Lynn*, 118 F.3d 938, 947 (2d Cir. 1997); *Broughton*, 37 N.Y.2d at 457. Probable cause for an arrest is a complete defense against malicious prosecution claims. *See Napolitano*, 604 F.3d at 751.

*b. Application*

For all the reasons discussed in the previous section, evidence tending to show that probable cause did not exist for Plaintiff's arrest also tends to show that probable cause did not exist for his prosecution. And in the context of a malicious prosecution claim, "[a] lack of probable cause generally creates an inference of malice." *Manganiello*, 612 F.3d at 163 (alteration in original) (quoting *Boyd v. City of N.Y.*, 336 F.3d 72, 78 (2d Cir. 2003)); *see also Ricciuti*, 124 F.3d at 131 ("[L]ack of probable cause generally raises an inference of malice sufficient to withstand summary judgment."). Thus, Plaintiff has made a sufficient showing that he will be able to satisfy the third and fourth elements of his malicious prosecution claim at trial.

There remains the question of *who* maliciously prosecuted Plaintiff. Defendants argue, in a footnote, that only Almontepichardo can be liable, as he was Plaintiff's arresting officer and signed off on Plaintiff's charges, and "Plaintiff has no evidence that any officer besides [Almontepichardo] did anything to 'commence or continue' [Plaintiff's] prosecution." Def. Br. at 9 n.6; *see also* 56.1 Stmt. ¶¶ 99–106. Plaintiff asserts that all of the Individual Defendants are

---

[22] Defendants primarily dispute the second, third and fourth elements, arguing that (i) Plaintiff cannot demonstrate a favorable termination of his prosecution, (ii) probable cause existed for Plaintiff's prosecution, and (iii) Plaintiff cannot show malice. *See* Def. Br. at 9–11.

equally liable for malicious prosecution, as all "were joint participants in a coordinated investigation, not passive bystanders removed from what ultimately reached the prosecution." Pl. Opp. at 18.

Neither position is completely correct. While it is true that liability for malicious prosecution can extend beyond the single officer whose signature adorns a charging instrument, *see, e.g.*, *Baker v. City of N.Y.*, 551 F. Supp. 3d 258 (S.D.N.Y. 2021), the Court has not seen, and Plaintiff has not identified, a single case in which individual liability for malicious prosecution arose merely from an officer's presence at a crime scene. To the contrary: for an individual officer to be held liable, it must be shown that he played "an active role in the prosecution, such as giving advice and encouragement or importuning the authorities to act." *Manganiello*, 612 F.3d at 163 (quoting *Rohman v. N.Y.C. Transit Auth.*, 215 F.3d 208, 217 (2d Cir. 2000)). The "initiation" element can be satisfied by evidence demonstrating that an officer processed a plaintiff's paperwork or had some interaction with the prosecuting authority. *See, e.g.*, *Rodriguez*, 291 F. Supp. 3d at 414. But the link need not be so direct. This Court has found the "initiation" prong of a malicious prosecution claim satisfied by evidence that an officer reported information to the officer who signed the criminal complaint, *see Bryant v. Crowe*, 697 F. Supp. 2d 482, 493 (S.D.N.Y. 2010), or made statements to the arresting officer that contributed to a criminal charge, *see Phelps v. City of N.Y.*, No. 04 Civ. 8570 (DLC), 2006 WL 1749528, at *4 (S.D.N.Y. June 27, 2006).

Still, in every case of which the Court is aware, the officer's liability is predicated on a more active role instigating the prosecution than merely responding to the scene after a report of criminal conduct.[23] Here, there is no evidence that certain of the Individual Defendants

---

[23] *Compare, e.g.*, *Baker*, 551 F. Supp. 3d at 258 (denying summary judgment where officer provided information about case to district attorney by drafting incident reports) *with Costello v. Milano*, 20 F. Supp. 3d 406,

discussed Plaintiff's arrest with Defendant Almontepichardo after departing from the scene on November 6, 2022. This is not surprising. Several of the Individual Defendants were not assigned to the same precinct as Defendant Almontepichardo and did not report to him, directly or otherwise. That Almontepichardo "conferred and coordinated" with Defendants Gomera, Liberatore, Marrone, Rinaldo, and Rivera "throughout the thirty-nine-minute investigation," Pl. Opp. at 18, is insufficient to create a question of fact whether those officers "distorted the process by which" Plaintiff "was brought to trial." *Buari v. City of N.Y.*, 530 F. Supp. 3d 356, 383 (S.D.N.Y. 2021) (quoting *Bailey v. City of N.Y.*, 79 F. Supp. 3d 424, 449 (E.D.N.Y. 2015)). To the "extent [the] officers failed to follow some leads or failed to accurately take notes evinces only carelessness," not the underpinnings of a malicious prosecution. *See Ramos v. City of N.Y.*, 285 A.D.2d 284, 301 (1st Dep't 2001). In short, summary judgment on Plaintiff's malicious prosecution claim is warranted as to Defendants Rinaldo, Liberatore, Gomera, Marrone, and Rivera.

That leaves Defendants Rodriguez and Chowdhury, both of whom are differently situated than their colleagues. A reasonable jury could conclude that, because Rodriguez and Chowdhury *witnessed* the initial altercation, yet failed adequately to relay that information to the arresting officer or otherwise note the circumstances that gave rise to Plaintiff's self-defense claims (either to the arresting officer or in their activity logs, which were ultimately transmitted to the district attorney), a fact finder could conclude that both had a role in "initiating" Plaintiff's prosecution.

---

419 (S.D.N.Y. 2014) (granting summary judgment for defendant officer where "[t]here is no evidence that [responding officer] initiated [the] prosecution for any of the crimes with which Plaintiff was charged . . . or involve[d] himself in Plaintiff's prosecution in any [] way"), *Israel v. City of N.Y.*, No. 16 Civ. 6809 (PGG), 2018 WL 11219076, at *7 (S.D.N.Y. Sept. 29, 2018) (granting summary judgment for defendant officer where there was "no evidence that [responding officer] told or discussed with" other officers what should be included in report, nor evidence that responding officer edited or made changes to report before approving it), *and Guillen v. City of N.Y.*, 625 F. Supp. 3d 139, 155 (S.D.N.Y. 2022) (granting summary judgment for responding officers who did not sign criminal complaint and did not make "inaccurate or incomplete statements to the District Attorney, misrepresent[] or falsif[y] evidence, or otherwise act[] in bad faith").

*See, e.g., Ragland v. City of N.Y.*, 45 Misc.3d 1218(A), 2014 WL 6461600, at *4 (Sup. Ct. Bronx Cnty. Nov. 18, 2014) ("[W]hen it is established that a defendant failed to fully disclose information which ought to have been disclosed . . . it can then be inferred that such omission or representation initiated the prosecution." (citing *Hopkinson v. Lehigh Valley R.R. Co.*, 249 N.Y. 296, 300 (1928))); *Ramos*, 285 A.D.2d at 299 ("New York law has long equated the civil defendant's failure to make a full and complete statement of the facts . . . or holding back information that might have affected the results, with that defendant's initiation of a malicious prosecution."). In other words, Plaintiff's malicious prosecution claims against Rodriguez and Chowdhury survive on the theory that, by omitting information highly pertinent to Plaintiff's self-defense claims, a fact finder could conclude that they contributed to his prosecution. Because Defendants Gomera, Liberatore, Marrone, Rinaldo, and Rivera were not themselves privy to such information, the "initiation" element of Plaintiff's malicious prosecution claim cannot be satisfied as to those officers.[24]

Finally, Defendants argue that Plaintiff cannot establish the second element of his New York State malicious prosecution claim as to any Defendant because he "cannot demonstrate a favorable termination of the prosecution." Def. Br. at 11; *see also* Def. Reply at 7. Plaintiff concedes that three of the four charges were dismissed by an adjournment in contemplation of

---

[24] This holding is broadly consistent with the Second Circuit's reticence to ascribe a version of "collective knowledge" to responding officers in cases involving malicious prosecution claims. "The collective knowledge doctrine provides that, for the purpose of determining whether an arresting officer had probable cause to arrest, 'where law enforcement authorities are cooperating in an investigation, . . . the knowledge of one is presumed shared by all.'" *Savino*, 331 F.3d at 74 (quoting *Illinois v. Andreas*, 463 U.S. 765, 772 n.5 (1983)); *see also supra* n.20. That doctrine is used "to *assist* officers in establishing probable cause—not to impute bad faith to one member of an enforcement team on the basis of another member's knowledge." *Savino*, 331 F.3d at 74. In fact, the Second Circuit has held that the "collective knowledge" doctrine "*cannot* be used to impute to an officer 'facts known to some [other] members of the police force which exonerate an arrestee.'" *Id.* (alteration in original) (quoting *United States v. Valez,* 796 F.2d 24, 28 (2d Cir. 1986))). Here, the basis of Plaintiff's malicious prosecution claim can be traced, if at all, to the omissions of Defendants Rodriguez and Chowdhury—not to the "collective" failings of the investigating officers. *See* Pl. Opp. at 18.

dismissal, which "does not constitute a favorable termination for purposes of a New York malicious prosecution claim."[25] Pl. Opp. at 19. Plaintiff's felony assault in the second degree charge (*i.e.*, the charge related to the stabbing), however, was dismissed pursuant to N.Y. Crim. P. Law § 170.30(1)(f), *see* 56.1 Stmt. ¶ 108, which can constitute a "favorable termination" for purposes of a New York State malicious prosecution claim, so long as the dismissal is not "inconsistent" with Plaintiff's innocence. *See Melchner v. Town of Carmel*, 195 A.D.3d 803 (2d Dep't 2021); *Harrison v. Cnty. of Nassau*, No. 15-CV-2712 (JFB) (AKT), 2018 WL 5093257, at *12 & n.6 (E.D.N.Y. Aug. 31, 2018) (undisputed "that a criminal proceeding was . . . terminated in Plaintiff's favor" following dismissal pursuant to N.Y. Crim. P. Law § 170.30(1)(f)), *report and recommendation adopted*, 2018 WL 4583491 (E.D.N.Y. Sept. 24, 2018), *aff'd*, 804 F. App'x 24 (2d Cir. 2020). Accordingly, a reasonable jury could find in Plaintiff's favor as to the second element of Plaintiff's New York State malicious prosecution claim as to the charge of assault in the second degree.[26]

---

25 An adjournment in contemplation of dismissal does not bar Plaintiff's federal malicious prosecution claims, however. *See, e.g.*, *Perez v. City of N.Y.*, No. 20-CV-1359 (LJL), 2022 WL 4236338, at *13–14 (S.D.N.Y. Sept. 14, 2022).

26 Under N.Y. Crim. P. Law § 170.30(1)(f), charges may be dismissed where "[t]here exists some [] jurisdictional or legal impediment to conviction." Defendants claim that there is nothing in the record that "specif[ies] what the 'jurisdictional or legal impediment to conviction' was," and without a formal acknowledgment that Plaintiff could not be lawfully convicted of the crime, the first element of Plaintiff's malicious prosecution claim necessarily fails. Def. Reply at 7. As far as the Court can discern, that is not an accurate statement of the law. *See Defeo v. Leibstein*, No. 16-CV-5150 (SJF) (SIL), 2018 WL 5777023, at *5 (E.D.N.Y. Nov. 1, 2018) ("[N]o federal or state case has decided whether the disposition of a criminal proceeding pursuant to N.Y. Crim. Proc. L. § 170.30(1)(f) constitutes a per se 'favorable' or 'not favorable' termination for purposes of a malicious prosecution claim." (quoting *Morgan v. Nassau Cty.*, No. 03CV5109, 2009 WL 2882823, at *18 n.6 (E.D.N.Y. Sept. 2, 2009))). The criminal court transcript indicates only that "the assigned [assistant district attorney] . . . assessed this case and the facts" and "[b]eing that there is no serious physical injury . . . and the [D]efendant's age and lack of criminal record, the People [] believe that this offer [to dismiss] is appropriate." Ex. H., Dkt. 84-8 at 2:15–25; *see also* Def. Reply at 7. There is no "jurisdictional" rationale for dismissal anywhere in the assistant district attorney's explanation. The Court is left to conclude that the prosecution's mealy-mouthed justification was an attempt to articulate some sort of "legal impediment" to conviction. The Court will not speculate what, exactly, that impediment was, other than to note that its apparent existence provided a sufficient basis to terminate the top criminal charge. Under the circumstances present here, there is a sufficient basis for a fact finder to conclude that the termination was in Plaintiff's favor and not inconsistent with his innocence. *See Gem Fin. Serv., Inc. v. City of N.Y.*, 298 F. Supp. 3d 464, 502 n.46 (E.D.N.Y. 2018) ("[N.Y. Crim. P. Law] § 170.30(1)(f) allows dismissal for

In sum, Defendants' motion for summary judgment on Plaintiff's New York State law malicious prosecution claim (Count VI) is DENIED as to Defendants Almontepichardo, Rodriguez, and Chowdhury as to the assault charge, and GRANTED as to Defendants Rinaldo, Liberatore, Gomera, Marrone, and Rivera. Because an adjournment in contemplation of dismissal does not bar Plaintiff's federal malicious prosecution claims, *see supra* n.25, Defendants' motion for summary judgment on Plaintiff's claim pursuant to Section 1983 (Count II) is DENIED as to Defendants Almontepichardo, Rodriguez, and Chowdhury as to each underlying charge against Plaintiff, and GRANTED as to Defendants Rinaldo, Liberatore, Gomera, Marrone, and Rivera.

## III. Denial of Right to Fair Trial Claim (Count III)

### *a. Legal Standard*

To prove a claim of denial of the right to a fair trial, Plaintiff must prove that the investigating officers provided the prosecutor "fabricated evidence [] that [was] likely to influence a jury's decision," and the plaintiff "suffered a deprivation of liberty as a result." *Perez v. Duran*, 962 F. Supp. 2d 533, 543 (S.D.N.Y. 2013) (cleaned up) (quoting *Jovanovic v. City of N.Y.*, 486 F. App'x 149, 152 (2d Cir. 2012) (summary order)). "[F]raudulent omissions . . . can serve as fabricated evidence for the purposes of a claim for denial of a fair trial." *Jackson v. Nassau Cnty.*, 552 F. Supp. 3d 350, 374 (E.D.N.Y. 2021); *see also Hutchins v. Solomon*, No. 16-CV-10029 (KMK), 2018 WL 4757970, at *17 (S.D.N.Y. Sept. 29, 2018) ("[I]n the context of a fabrication of evidence claim, the Second Circuit equates 'the fraudulent

---

'legal impediment' to convictions, including presumably innocence, and may serve as a basis for a malicious prosecution claim."). *But see Adam v. Metro. Transp. Auth.*, No. 07-CV-8807 (JGK), 2011 WL 891441, at *7 (S.D.N.Y. Mar. 15, 2011) (noting "plaintiff does not explain what the legal impediment was . . . and there is nothing in the record to support the plaintiff's assertion that the 'impediment' was the plaintiff's innocence," but dismissing malicious prosecution claim on other grounds).

omission of factual information . . . with the affirmative perpetration of a falsehood,' and expressly disclaims any 'plausible legal distinction between misstatements and omissions.'" (quoting *Morse v. Fusto*, 804 F.3d 538, 550 (2d Cir. 2015))).

*b. Application*

Plaintiff's denial of fair trial claim against Defendants Rinaldo, Liberatore, Gomera, Marrone, and Rivera fails, largely for the reasons already discussed: there is no evidence in the record from which a reasonable jury could conclude that these officers were "personally involved" in Plaintiff's prosecution, either by fabricating evidence or fraudulently omitting facts that were known to them. *See, e.g.*, *Rodriguez*, 291 F. Supp. 3d at 415. By contrast, there is sufficient evidence to raise a triable issue of fact as to whether Defendants Rodriguez and Chowdhury fabricated evidence by failing to report or document relevant details about the basis of Plaintiff's self-defense claim of which they were (or should have been) aware by virtue of their involvement in the initial altercation. Likewise, the Court concludes that there is sufficient evidence for a reasonable jury to conclude that Defendant Almontepichardo, as Plaintiff's arresting officer, "was in a position to know the full exculpatory picture," yet "omit[ted] key details and evidence" from the reports that were ultimately forwarded to the District Attorney. Pl. Opp. at 21. Accordingly, Defendants' motion for summary judgment on Plaintiff's denial of right to a fair trial claim (Count III) is DENIED as to Defendants Almontepichardo, Rodriguez, and Chowdhury and GRANTED as to Defendants Rinaldo, Liberatore, Gomera, Marrone, and Rivera.

## IV. Failure to Intervene Claim (Count IV)

Law enforcement officers have an affirmative duty to intervene to prevent their fellow officers from infringing a citizen's constitutional rights. *E.g.*, *Guerrero v. City of N.Y.*, No. 16-

CV-516 (JPO), 2017 WL 2271467, at *3 (S.D.N.Y. May 23, 2017). An officer can be liable under Section 1983 for failure to intervene where: (i) "the officer had a realistic opportunity to intervene and prevent the harm;" (ii) "a reasonable person in the officer's position would know that the victim's constitutional rights were being violated;" and (iii) "the officer does not take reasonable steps to intervene." *Id.* "Where the officer is a direct participant in the allegedly unlawful conduct, the failure to intervene theory of liability is inapplicable." *Sanabria v. Tezlof*, No. 11-CV-6578 (NSR), 2016 WL 4371750, at *5 (S.D.N.Y. Aug. 12, 2016); *see also Marom v. City of N.Y.*, No. 15-CV-2017 (PKC), 2016 WL 916424, at *19 (S.D.N.Y. Mar. 7, 2016) ("[D]efendants cannot be liable for both the underlying constitutional deprivation and a failure to intervene to stop themselves from committing that violation.").

As previously discussed, there is insufficient evidence in the record for a jury to find that a reasonable person in the position of Defendants Rinaldo, Liberatore, Gomera, Marrone, and Rivera would have known that Plaintiff's constitutional rights were being violated. As such, Defendants' motion for summary judgment on Plaintiff's failure to intervene claim (Count IV) is GRANTED as to Defendants Rinaldo, Liberatore, Gomera, Marrone, and Rivera. Because a jury could conclude that Defendants Almontepichardo, Rodriguez, and Chowdhury directly participated in the allegedly unlawful conduct, *see supra* Sections I–III, Plaintiff's alternative theory of liability may be moot. If a jury were to find that Defendants Almontepichardo, Rodriguez, or Chowdhury were not direct participants in the constitutional violations, the Court concludes that there is nonetheless sufficient evidence in the record from which a jury could conclude that one or each of Almontepichardo, Rodriguez, or Chowdhury failed to intervene to prevent the allegedly unlawful conduct. Accordingly, Defendants' motion for summary

judgment on Plaintiff's failure to intervene claim as to Defendants Almontepichardo, Rodriguez, and Chowdhury is DENIED.

## V. New York City Administrative Code Claims (Count VII)

Plaintiff also asserts claims against the Individual Defendants and the City arising under Chapter 8, Title 8 of New York City's Administrative code. *See* Compl. ¶¶ 148–153. Both parties agree that "the substantive rights protected by the Administrative Code are defined by reference to their state and federal counterparts, so these claims rise and fall with Plaintiff's underlying" claims under the Constitution. Pl. Opp. at 24; Def. Br. at 14; *see also* N.Y.C. Admin. Code §§ 8-803, 8-807.

Because Plaintiff has not established a question of fact on any of his underlying constitutional claims as to Defendants Rinaldo, Liberatore, Gomera, Marrone, and Rivera, *see supra* Sections I–IV, his parallel claim under the City's Administrative Code necessarily fails. Defendants' motion for summary judgment on Plaintiff's New York City Administrative Code claim (Count VII) is GRANTED as to Defendants Rinaldo, Liberatore, Gomera, Marrone, and Rivera. Plaintiff has viable constitutional claims against Defendants Almontepichardo, Rodriguez, and Chowdhury; as such, Defendant's motion for summary judgment on Plaintiff's New York City Administrative Code claim is DENIED as to these officers. Likewise, Plaintiff's New York City Administrative Code claim against the City survives.

## VI. New York State Tort Claims (Counts VIII, IX)

Plaintiff's remaining claims are for the state law torts of assault and battery (against the City and Individual Defendants), *see* Compl. ¶¶ 154–55, and negligent hiring, screening, training, supervision, and retention (against the City), *see id.* ¶¶ 156–158. Plaintiff concedes that there is insufficient evidence in the record to raise a genuine dispute of fact as to whether the

Individual Defendants' conduct was the result of the City's negligence. *See* Pl. Opp. at 25 n.3. Defendant's motion for summary judgment on Plaintiff's negligent hiring claim (Count IX) is, therefore, GRANTED.

As for Plaintiff's assault and battery claim, Plaintiff is correct that, under New York law, "[i]f an arrest is determined to be unlawful, any use of force against a plaintiff may constitute an assault and battery, regardless of whether the force would be deemed reasonable if applied during a lawful arrest." *Sulkowska v. City of N.Y.*, 129 F. Supp. 2d 274, 294 (S.D.N.Y. 2001) (collecting cases); *see also* Pl. Opp. at 24–25. Because genuine disputes of material fact preclude summary judgment on Plaintiff's false arrest claim as to Defendants Almontepichardo (Plaintiff's arresting officer) and Rodriguez, Defendants' motion for summary judgment on Plaintiff's assault and battery claim (Count VIII) is DENIED as to Defendant Almontepichardo, Rodriguez, and the City (under a vicarious liability theory, *see* Compl. ¶ 155).[27] Defendants' summary judgment motion on Plaintiff's assault and battery claim is GRANTED as to Defendants Rinaldo, Liberatore, Gomera, Marrone, and Rivera, and Chowdhury,[28] none of whom appears to have made physical contact with Plaintiff during his arrest.

---

[27] A municipality may be held vicariously liable for the unlawful acts of its employees committed within the scope of their employment. *See, e.g.*, *Green v. City of N.Y.*, 465 F.3d 65, 86 (2d Cir. 2006). Defendants do not dispute that Defendants Almontepichardo and Rodriguez were acting within the scope of their employment when Plaintiff was arrested. *See* Def. Br. at 16; Def. Reply at 8–9.

[28] Although Plaintiff's claims against Chowdhury for false arrest and malicious prosecution survive summary judgment, his claim against Chowdhury for assault and battery does not as there is no evidence that Chowdhury ever touched Plaintiff during his arrest. *See generally* Ex. 6, Dkt. 90-6 (Chowdhury BWC).

## VII. Qualified Immunity

Finally, the Court must consider whether Defendants Almontepichardo, Rodriguez, and Chowdhury, although potentially liable for violating Plaintiff's constitutional rights, are nonetheless qualifiedly immune from suit.[29]

### *a. Legal Standard*

Qualified immunity shields a government official from money damages when his conduct did "not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *City of Escondido v. Emmons*, 586 U.S. 38, 42 (2019) (per curiam) (quoting *Kisela v. Hughes*, 584 U.S. 100, 104 (2018) (per curiam)); *see also, e.g.*, *Davis v. Scherer*, 468 U.S. 183, 197 (1984) ("A plaintiff who seeks damages for violation of constitutional or statutory rights may overcome the defendant official's qualified immunity only by showing that those rights were clearly established at the time of the conduct at issue."). Qualified immunity is a "demanding" doctrine protecting "all but the plainly incompetent or those who knowingly violate the law." *District of Columbia v. Wesby*, 583 U.S. 48, 63 (2018) (quoting *Malley v. Briggs*, 475 U.S. 335 (1986)).

Qualified immunity analysis in the Second Circuit involves two core inquiries: (1) whether the plaintiff's constitutional rights were violated, and (2) whether those rights were clearly established at the time of the alleged violation. The second prong—objective reasonableness—asks whether a reasonable officer could have believed the conduct at issue was lawful in light of clearly established law. *See, e.g.*, *Sacaza v. City of N.Y.*, 169 F.4th 363, 369–70 (2d Cir. 2026) (collecting cases). "In the context of an arresting officer, qualified immunity applies where it was objectively reasonable to believe there was probable cause to

---

[29] The Court's qualified immunity analysis would apply with equal force to all Individual Defendants, regardless of whether, as here, summary judgment is warranted (for some) on other grounds.

make the arrest, or there was arguable probable cause—that is, where reasonable police officers could disagree as to the existence of probable cause." *Id.* at 370.

While a plaintiff need not identify "a case directly on point" to demonstrate that an asserted federal right was clearly established at the time a defendant acted, the Supreme Court has instructed time and again that "existing precedent must have placed the statutory or constitutional question beyond debate." *Mullenix v. Luna*, 577 U.S. 7, 12 (2015) (per curiam) (quoting *Ashcroft v. al–Kidd,* 563 U.S. 731, 741 (2011)); *see also, e.g.*, *Emmons*, 586 U.S. at 43–44; *Wesby*, 583 U.S. at 61–65 ("The rule must be settled law, . . . which means it is dictated by controlling authority or a robust consensus of cases of persuasive authority." (internal quotation marks and citations omitted)); *White v. Pauly*, 580 U.S. 73, 77–81 (2017) (per curiam) ("[G]eneral statements of the law are not inherently incapable of giving fair and clear warning to officers, . . . but in the light of pre-existing law the unlawfulness must be apparent." (internal quotation marks and citation omitted)). Courts may not "define clearly established law at too high a level of generality," and "[i]t is not enough that a rule be suggested by then-existing precedent; the rule's contours must be so well defined that it is clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *City of Tahlequah v. Bond*, 595 U.S. 9, 12 (2021) (per curiam) (internal quotation marks omitted); *see also Brosseau v. Haugen*, 543 U.S. 194, 198–99 (2004) (per curiam); *Soukaneh v. Andrzejewski*, 112 F.4th 107, 116, 123–24 (2d Cir. 2024) ("[F]or a right to be clearly established for purposes of qualified immunity, it is sufficient if decisions of the Supreme Court or of the appropriate circuit have defined the contours of the right with reasonable specificity.").

*b. Application*

In their briefing, Defendants conflate two related but conceptually distinct qualified immunity arguments. First, Defendants contest whether Plaintiff has identified any clearly established rights at issue. *See* Def. Br. at 16–20; Def. Reply at 9–10. Second, Defendants seem to argue that even if Plaintiff has identified clearly established rights, the record does not clearly establish that the Individual Defendants *violated* those rights. *See* Def. Br. at 16–20; Def. Reply at 9–10. Separately, Defendants argue that they are entitled to qualified immunity "because there was at least 'arguable probable cause' to arrest and prosecute [P]laintiff"—*i.e.*, that it was objectively reasonable to arrest Plaintiff, or that police officers of reasonable competence could have disagreed as to whether probable cause for Plaintiff's arrest existed. Def. Br. at 17; *see also* Def. Reply at 9. Plaintiff disagrees, asserting that the constitutional rights at issue were clearly established and the Individual Defendants clearly violated them, and that Defendants cannot establish that even arguable probable cause existed. *See* Pl. Opp. at 26–27.

Plaintiff's "most on point" argument is that, at least since the Second Circuit decided *Jocks v. Tavernier*, 316 F.3d 128 (2d Cir. 2003), it has been clearly established that "officers are not permitted to 'disregard facts known to them which establish justification'" for otherwise criminal conduct (*e.g.*, a stabbing, if in self-defense). Pl. Opp. at 26 (quoting *Jocks*, 316 F.3d at 135). Even if *Jock*s does establish *some* constitutional right, the Court is not persuaded that Plaintiff's broad articulation of that right is warranted, nor that the right is implicated here. There are significant differences between the facts in *Jocks* and the facts of this case that render the two situations materially distinguishable. For example, *Jocks* involves a plaintiff claiming that he was acting in self-defense against the very officer who was arresting him. *See Jocks*, 316 F.3d at 136. The case suggests that an officer cannot disregard evidence of self-defense when he

*himself* created the circumstances that negate probable cause (and thus demonstrate the officer's unequivocal awareness of the facts giving rise to the self-defense claim). Here, it is undisputed that no officer (nor any witness) saw Heyliger being stabbed. Given Supreme Court jurisprudence in this area, the Court cannot read *Jocks* to stand for the broader proposition that when officers *may* have sufficient information to conclude that a person *may* have been acting in self-defense, they cannot reconcile their uncertainty in favor of the individual presenting himself with a visible stab wound following a melee that involved multiple people, including the plaintiff.[30]

The Court also finds, based on the undisputed facts in the record, that reasonable police officers in the positions of Defendants Almontepichardo, Rodriguez, and Chowdhury could have found that probable cause warranted Plaintiff's arrest (*i.e.*, that "arguable probable cause" existed). On this point, Plaintiff's primary argument is that "[t]he Individual Defendants [] ignored" "credible exculpatory evidence," as well as "every corroborating piece of evidence presented to them"—information that, if properly recovered, documented, and considered, would have served to exculpate Plaintiff. Pl. Opp. at 28. This argument is unavailing. The allegedly "exculpatory evidence" (*i.e.*, security camera footage and witness statements tending to suggest Plaintiff was acting in self-defense) to which Plaintiff points neither definitively proves nor

---

[30] The "correct inquiry," as the Supreme Court has counseled, is "whether it was clearly established that the Fourth Amendment prohibited the officer's conduct *in the situation* [*he*] *confronted*." *Mullenix*, 577 U.S. at 13 (emphasis added) (internal quotation marks omitted). Although a loose reading of *Jocks* may comport with Plaintiff's interpretation, the facts in *Jocks* do not map onto this case with the "required degree of specificity" that the reasonableness inquiry demands. *Mullenix*, 577 U.S. at 13 (citing *Anderson v. Creighton*, 483 U.S. 635 (1987)); *see also Brosseau*, 543 U.S. at 199 (noting that "a body of relevant case law" is usually necessary to "'clearly establish' the answer" with respect to probable cause). At bottom, Plaintiff is asking for a finding that this is one of the "rare" cases in which "the unlawfulness of the officer's conduct is sufficiently clear even though existing precedent does not address similar circumstances." *Wesby*, 583 U.S. at 64. The Court cannot make such a finding based on the record in front of it. *See id.* at 64–65 ("[T]his is not an 'obvious case' where 'a body of relevant case law' is not needed."). Furthermore, Plaintiff has not identified any precedent (beyond *Jocks*) that could help clarify whether his interpretation of *Jocks* is supported by other case law.

disproves that Plaintiff's arrest was appropriate. At most, the evidence shows that Defendants Rodriguez and Chowdhury saw a portion of the initial altercation before witnessing Plaintiff flee with his baseball-bat wielding neighbor (and others) chasing behind. Plaintiff has not presented any evidence that demonstrates *when* Heyliger was stabbed, nor that depicts the events in the moments that the stabbing occurred. A reasonable officer could believe that, if after breaking up a physical fight and pursuing the combatants down a street, one of the combatants approaches with a stab wound and identifies his assailant, there exists a plausible basis to arrest and charge the one accused of the stabbing.[31] *See Lennon v. Miller*, 66 F.3d 416, 421 (2d Cir. 1995) ("[I]n qualified immunity cases, we are not concerned with the correctness of the [officer's] conduct, but rather the 'objective reasonableness' of their chosen course of action given the circumstances confronting them at the scene.").

It is Plaintiff's position that "a jury must pass judgment on" the Individual Defendants' choices—namely, their failure to review, in real time, the existing video footage or to obtain pedigree information from witnesses. *See* Pl. Opp. at 28. Plaintiff's position is simply not the law. If, based on the evidence in the record,[32] the Court determines that a reasonable jury could

---

[31] Plaintiff claims that "Defendants' arguable probable cause argument rests almost entirely on their unsupported assertion that Plaintiff 'admitted' to stabbing Heyliger on scene." *See* Pl. Opp. at 27. That is not an entirely accurate statement of Defendants' position. But even if the Court were to agree that there is "no record evidence for [Defendants'] claim," *see id.*, it cannot be said that the officers' judgment was "'so flawed that no reasonable officer would have' arrested [P]laintiff," given the undisputed evidence that "a victim with a visible stab wound reported that [P]laintiff, who was uninjured, stabbed him and where there was no footage of or witnesses to the stabbing itself." *See* Def. Reply at 9 (quoting *Provost*, 262 F.3d at 160). It is also not outside the realm of possibility that the Individual Defendants believed Plaintiff was being chased *because* he stabbed Heyliger. *See, e.g.*, Ex. 4, Dkt. 90-4 at 271:14–273:7 (discussing BWC footage in which Rodriguez appears to say that Plaintiff "stabbed first and then [Heyliger] came after him because of that," although, at his deposition, Rodriguez indicated "that's not what [he] meant"). This belief would have been mistaken, but the record is devoid of evidence from which the Court can conclude that it would have been objectively unreasonable.

[32] The video and BWC footage confirm that the sequence of events prior to Plaintiff's arrest could have led a reasonable officer to arrest and charge Plaintiff. In particular, the record makes clear that: (i) Defendants Rodriguez and Chowdhury did not cross the street to intervene during the initial altercation until *after* Plaintiff and his neighbors were engaged in physical combat, at which point Ms. Simmons was also assaulting Ms. Ocascio Rodriguez; (ii) Defendant Rodriguez saw an individual charge Plaintiff with a baseball bat, leading Plaintiff to run away from the baseball-bat wielding assailant; (iii) neither Defendants Rodriguez nor Chowdhury nor any other

go either way on this issue—that is, the jury could find that probable cause to arrest Plaintiff existed or it could find that probable cause to arrest Plaintiff did not exist—"the appropriate remedy is not to leave that determination to the jury, but to grant summary judgment on qualified immunity to the officer[s]." *See Sacaza*, 169 F.4th at 372 (citing *Cerrone v. Brown*, 246 F.3d 194, 203 (2d Cir. 2001)).

The Court also finds that the Individual Defendants are entitled to qualified immunity on Plaintiff's New York State law claims because "the record, even construed in [Plaintiff's] favor, does not establish bad faith." *Triolo v. Nassau Cnty.*, 24 F.4th 98, 107 (2d Cir. 2022).[33] "[Q]ualified immunity is an individual affirmative defense that does not protect municipalities," however, and a "municipal employer is vicariously liable for the wrongs of its employee, even when the employee is individually immune, so long as the wrong was committed within the scope of employment." *Id.* at 110. The Court's qualified immunity holding as to the Individual

---

known individual witnessed Heyliger being stabbed; (iv) when Rodriguez caught up to Heyliger and the others, Plaintiff had already gone into a convenience store; and (v) Plaintiff was not detained until Heyliger approached Almontepichardo, Rodriguez, and other officers, with his stab wound exposed, motioning toward Plaintiff. Thus, even if there exists some dispute about the precise moment that the officers became aware that Heyliger had been stabbed (or about when, precisely, Heyliger was stabbed), there is plenty of evidence in the record to support Rodriguez's threshold determination that there was probable cause to arrest Plaintiff.

The Individual Defendants' BWC footage also confirms that the officers, including Defendants Almontepichardo, Rodriguez, and Chowdhury, received information from witnesses that tends to bolster Plaintiff's narrative that he was acting in self-defense. But again, none of those bystanders professed to have witnessed Heyliger's stabbing (as opposed to the initial altercation outside of Plaintiff's apartment). A reasonable police officer could have believed that Plaintiff committed a crime justifying arrest—notwithstanding commentary from witnesses supporting Plaintiff's claim of self-defense and notwithstanding the fact that one officer saw an assailant trailing Plaintiff with a bat. Put differently: the video and BWC footage in the record is exculpatory (to the Individual Defendants) in some respects and inculpatory in others. *See Sacaza*, 169 F.4th at 372. But unless the record indicates that "*no* reasonable police officer could find that probable cause existed," the defendant is entitled to qualified immunity. *Id.*

[33] The Second Circuit recently noted that "[u]nder New York state law, the test for qualified immunity or its equivalent may vary from that of federal law," *Sacaza*, 169 F.4th at 370 n.5, inasmuch as it includes both objective and subjective components, *see Lore v. City of Syracuse*, 670 F.3d 127, 166 (2d Cir. 2012) ("[T]he New York standard for entitlement to qualified immunity has both objective and subjective components."). Notwithstanding any confusion on this issue, *see Sacaza*, 169 F.4th at 370 n.5, the Court assumes, for purposes of the present motion, that the more stringent two-component standard controls. Because the record does not show that the Individual Defendants acted in bad faith, they are entitled to qualified immunity under New York State law.

Defendants, therefore, does not shield the City from potential liability as to Plaintiff's surviving New York State law claims. Similarly, Section 8 of New York City's Administrative Code explicitly strips officers of a qualified immunity defense for claims brought under its provisions. *See, e.g.*, *Jeanty v. City of N.Y.*, No. 23-CV-9472, 2024 WL 5236462, at *36 (E.D.N.Y. Dec. 28, 2024) (citing N.Y.C. Admin. Code § 8-804). Thus, Defendants Almontepichardo, Rodriguez, and Chowdhury, and the City[34] remain potentially liable for the officers' alleged violations of the New York City Administrative Code. *See supra* Section V.

* * *

The Court "recognize[s] the apparent anomaly of holding that summary judgment is appropriate when a trier of fact would find that reasonable officers could disagree." *Lennon*, 66 F.3d at 421. "But in the context of arguable probable cause, law enforcement officers must be granted qualified immunity if a reasonable jury *could* find that there was probable cause." *Sacaza*, 169 F.4th at 373 (citing *Lennon*, 66 F.3d at 424–25). Because a reasonable jury could find that probable cause existed to support Plaintiff's arrest and prosecution, Defendants Almontepichardo, Rodriguez, and Chowdhury are entitled to qualified immunity from Plaintiff's claims brought pursuant to federal law. So too for Plaintiff's claims under New York State law.[35] Defendants' motion for summary judgment on Plaintiff's remaining state and federal claims against Almontepichardo, Rodriguez, and Chowdhury is, therefore, GRANTED.[36]

---

[34] Section 8-803(b) of the N.Y.C. Admin. Code makes "[t]he employer of a covered individual" liable "based upon the conduct of such covered individual."

[35] *See supra* n.33 and accompanying text.

[36] It bears repeating that, in the Court's view, the police conduct here (particularly that of Defendant Rodriguez) can be best described as apathetic, perfunctory, and disturbingly unthorough. This is not what New York City residents should expect from their police force. While the Individual Defendants may be off the hook for some of Plaintiff's claims, they should not be proud of their how they performed their job on the evening of November 6, 2022.

## CONCLUSION

For the foregoing reasons, Defendants' motion for summary judgment is GRANTED as to all claims against Defendants Rinaldo, Liberatore, Gomera, Marrone, and Rivera. Summary judgment on Plaintiff's claims under Section 1983 and New York State law is GRANTED in favor of Defendants Rodriguez, Chowdhury, and Almontepichardo on the ground that each is entitled to qualified immunity. Defendants' motion for summary judgment is DENIED as to the City on Plaintiff's New York State law claim for assault and battery. Defendants' motion for summary judgment is DENIED as to Defendants Rodriguez, Chowdhury, Almontepichardo, and the City on Plaintiff's New York City Administrative Code claims.[37]

The Clerk of Court is respectfully directed to terminate the open motion at Dkt. 83. The Clerk of Court is also directed to terminate Defendants Rinaldo, Liberatore, Gomera, Marrone, and Rivera as parties to this action.

Not later than **Tuesday, August 25, 2026**, the parties are directed to meet and confer and submit a joint letter, not to exceed three (3) pages, (i) providing four mutually acceptable Mondays (or Tuesday if Monday is a holiday) between November 2, 2026, and February 26, 2027, to begin trial on Plaintiff's surviving claims and (ii) stating whether both parties seek a settlement conference with the assigned Magistrate Judge.

**SO ORDERED.**

**Date: August 4, 2026**
**New York, New York**

**VALERIE CAPRONI**
**United States District Judge**

[37] It is undisputed that Plaintiff's lone remaining state law claims arise from the "same 'common nucleus of operative fact[s]'" as the federal claims dismissed in this Order. *Montefiore Med. Ctr. v. Teamsters Local 272,* 642 F.3d 321, 332 (2d Cir. 2011) (quoting *United Mine Workers v. Gibbs,* 383 U.S. 715, 725 (1966)). Given the posture of the case (all discovery is complete), the Court will exercise supplemental jurisdiction over Plaintiff's remaining claims pursuant to 28 U.S.C. § 1367(a).